IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JOHN E. TAYLOR (#283906),          :
                                   :
        Plaintiff,                 :
                                   :
vs.                                :    CIVIL ACTION 16-0251-KD-M
                                   :
SHERIFF SAM COCHRAN,               :
                                   :
        Defendant.                 :

REPORT AND RECOMMENDATION

This action is before the Court on the Motion for Summary Judgment (Docs. 13, 14) filed by Defendant Sam Cochran under Federal Rule of Civil Procedure 56.  This Motion has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72.  Plaintiff has filed a Response in Opposition (Doc. 17).  After careful consideration of the record, it is recommended that the Motion for Summary Judgment be granted, that this action be dismissed with prejudice, and that judgment be entered in favor of Defendant and against Plaintiff.

FACTUAL AND PROCEDURAL BACKGROUND

The undersigned observes as a preliminary matter that Plaintiff has filed another § 1983 action previously.  On September 8, 2015, the Plaintiff filed an action against Defendant Sheriff Sam Cochran alleging that he had not been provided requested nutritional information.  (*Taylor v. Sheriff Sam Cochran*, No. 1:15-cv-00448-WS-B (S.D. Ala. Jan. 15,

2016)(hereinafter, "Taylor I"), Doc. 1.)  This action was dismissed as frivolous prior to service of process.  (*Taylor I*, Doc. 11.)

From its review of the record, the Court summarizes the material factual allegations in this case in the light most favorable to the Plaintiff.[1]  Plaintiff has at all times been an inmate in the Mobile County Metro Jail (hereafter, "the Jail"), which is run by the Sheriff of Mobile County, Defendant Sam Cochran.  (*See* Doc. 1 at 3; Doc. 14 at 1.)  Plaintiff is a pretrial detainee being held on charges of violating the Sexual Offender Registration Act (SORNA).  (Doc. 1 at 5; Doc. 14 at 3; *State of Ala. v. Taylor*, Case No. CC-2015-005474.00, Mobile County Circuit Court.)  Plaintiff is housed in Pod 905C, a section of the Jail commonly referred to as a wedge (hereafter, Pod 905C is referred to as "the Wedge").  (Doc. 14 at 1; Doc. 19 at 2.)

Plaintiff alleges that Defendant has committed numerous "civil, human and constitutional rights violations . . . ." (Doc. 1 at 3.)  Concerning the showers made available to inmates at the Jail, Plaintiff alleges that "We are forced to live with

---

[1] For summary judgment purposes, the Court's analysis must begin with a description of the facts in the light most favorable to Plaintiff, who is the non-moving party. *See Skritch v. Thornton*, 280 F.3d 1295, 1299 (11th Cir. 2002).  "[T]he 'facts' as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case." *Priester v. City of Rivera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000).

leaking, raw sewage. And have now for a year." (*Id.* at 4.)

Plaintiff further alleges that "Maintenance has repeatedly

ignored sewage leak in our shower area. We are forced to stand

in it while showering." (*Id.*)  This allegation is supported by

the Plaintiff's own affidavit and that of Kevin D. Manassa.

(Docs. 19, 20.)  Mr. Manassa states that he has been

"incarcerated and placed in Wedge 905-C off and on since

November 2014." (Doc. 19 at 1.)  He states that in the Wedge,

> The toilet has been leaking raw sewage in the shower
> area as far back as 2014. Myself and others has filed
> many grievances pertaining to this as well as other
> health safety issues which <u>still</u> exist. (<u>All</u>
> grievances were recently deleted)
>
> Even though the Mobile County Grand Jury does a bi-
> monthly walk through of this facility We remain locked
> in our cells during that time and they <u>do not</u> come
> into the wedge. Therefore no inspection is properly
> conducted.
>
> I have personally never seen the fire department or
> the health department do any kind of inspection in the
> 905 area of the Jail.

(*sic*; Doc. 19 at 1-2.)  The allegation is also supported by the

declarations of two other inmates in the Wedge, Jerome Smith and

Brian Hester. (Docs. 8, 9.)  They state that they have been

incarcerated in the Wedge since November 2015 and December 2015,

respectively, and that a toilet has leaked raw sewage into the

shower area since they have been in the Wedge. (Doc. 9 at 1;

Doc. 8 at 1.)

   Defendant's Motion for Summary Judgment, in relevant part,

opposes this allegation:

> The Mobile County Sheriff's Office operates the jail
> but the physical facility is owned and maintained by
> Mobile County.  Whenever a maintenance issue arises
> such as backups, non-working fixtures, leaks etc., a
> request is generated to the Mobile County Maintenance
> Department through its work order system.  In most
> situations the matter can be resolved quickly, however
> some conditions take longer to remedy either because
> of the nature of the work required or the scope of the
> work necessary to address that problem . . .
>
> The facility is inspected by the Mobile County Health
> Department and the City of Mobile Fire Department.
> The Mobile County Grand Jury conducts monthly
> inspections of the jail.  Any issues noted have been
> addressed accordingly.
>
> Due to its age and location the Mobile County Jail has
> experienced plumbing problems, but those problems have
> been addressed and corrected to the best of the Jail
> staffs knowledge . . . There is no evidence that any
> unhealthy or dangerous condition is left unabated.

(*sic*; Doc. 14 at 1-2.)  The Motion for Summary Judgment is

supported by the affidavit of Robert Houston, the Deputy Warden

at the Jail, which attests to the inspection and maintenance

procedures described in the Motion.  (Doc. 14-1 at 1-2.)  The

Motion is also supported by the records of work orders submitted

to Mobile County Public Works Department by the Sheriff's

Office.  (Doc. 14-3.)  The work order records cover November

2015 to August 2016 and include dozens of completed orders

concerning leaking toilets, including a completed repair to a

toilet in the Wedge that was specifically described as "leaking

in shower."  (Doc. 14-3 at 2.)

   Plaintiff also makes a number of other allegations, which

are not supported by the affidavits or declarations of other

inmates.  Plaintiff complains that there are "improper or non-working sinks" in the cells, that the "walls are covered in black mold in the Shower area," and "[a]ir vents are covered with and surrounded by the build up of dust and contaminates." (Doc. 1 at 4-5, 7.)  Defendant responds to these allegations with the work orders detailing their efforts to repair sinks in the Wedge, and with the description above of the usual procedures for maintenance.  (Doc. 14-3 at 2-16; Doc. 14 at 1-2.)  Defendant also responds with excerpts from the Inmate Handbook (Doc. 14-4).  The Handbook details that "inmates are required to clean their cell and share in the maintaining of cleanliness throughout the jail."  (Doc. 14-3 at 2.)  In return, "[c]leaning supplies are provided to the inmates to perform daily cleaning" and "[w]hen more substantial cleaning is needed, like power washing, that task is done either by corrections officers or country maintenance."  (*Id.*)  Defendant asserts that "[t]here is not evidence that any unhealthy or dangerous condition is left unabated."  (Doc. 14 at 2.)  Plaintiff complains that this work required by the Inmate Handbook is required of inmates without any type of "compensation" in the form of "good-time."  (Doc. 1 at 7.)

Plaintiff makes a number of complaints regarding visitation and mail requirements.  (Doc. 1 at 7-9.)  Plaintiff alleges that "mail is repeatedly undelivered, unreceived or, at best, late,"

that test letters mailed to or from family members were not
received, and that many pieces of mail arrive "extremely late."
(*Id.* at 7-8.)  Plaintiff complains that inmates are "not allowed
to properly bond and interact with families as needed
emotionally because our letters have to be written on postcard."
(*Id.* at 9.)  Plaintiff alleges that he is unable to contact
family members or attorneys due to excessive lock-down time, up
to 17 hours per day, including during the 6pm-8pm hours, which
Plaintiff alleges are the "peak hours to contact family and
attorneys." (*Id.* at 8.)  Plaintiff accuses Defendant of placing
"undue stress on family ties and bonds" because visitation has
been reduced from four full days per month to two half-days per
month. (*Id.*)

　　　Defendant responds to these allegations by saying that the
Jail "does have restrictions on personal mail. Those
restrictions were put in place . . . to reduce and/or eliminate
smuggling contraband into the facility and are reasonably
related to the needs of the jail for security and safety."
(*emphasis in original*; Doc. 14 at 3.)  "For the same reason
visitation is limited. Inmates are allowed a reasonable amount
of visitation with their family and only minimum restrictions
are placed on attorney and professional[] visitation." (*Id.*)
Mr. Houston swears that "[p]ersonal mail is limited to post
cards because in the Jail Administration's opinion other forms

of mail have been utilized to smuggle contraband into the facility.  Legal mail is treated differently than personal mail . . ."  (Doc. 14-1 at 2.)

Finally, Plaintiff complains that the Defendant "refuses to give ingredients and nutritional information of food" and that inmates "are forced to eat what defendant sends to us with no knowledge of ingredients . . . or go hungry."  (Doc. 1 at 9.) These are the allegations previously adjudicated as frivolous in *Taylor I.*  (*See, supra.*)  Defendant responds that "[t]here is no known requirement that the inmates be given a nutritional label for each item of food served, however, each inmate is provided a minimum of 2600 calories per day."  (Doc. 14 at 3.)  The Jail's third-party contractor is "contractually obligated to provide a minimum of 2600 calories per day for each inmate and to provided specialized diets when requested."  (*Id.*)

Based upon a liberal construction of Plaintiff's complaint, the Court construes his factual allegations as asserting claims that his conditions of confinement are constitutionally inadequate and that the Defendant acted with deliberate indifference in setting policies and procedures.  The undersigned will discuss each of these claims in turn individually below.

STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no *genuine* issue of material fact.' "(emphasis in original)).

> The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322—24.
>
> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex Corp.*, 477 U.S. at 324. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson*, 477 U.S. at 255.

*ThyssenKrupp Steel USA, LLC v. United Forming, Inc.*, 926 F.
Supp. 2d 1286, 1289-90 (S.D. Ala. 2013) (citations omitted).

As noted supra, the Court, in considering whether
Defendants are entitled to summary judgment in this case, views
the facts in the light most favorable to Plaintiff. *Comer v.*
*City of Palm Bay, Florida*, 265 F.3d 1186, 1192 (11th Cir. 2001)
("We view the evidence and all factual inferences raised by it
in the light most favorable to the non-moving party, and resolve
all reasonable doubts about the facts in favor of the non-moving
party."). The requirement to view the facts in the nonmoving
party's favor extends only to "genuine" disputes over material
facts, which requires more than "some metaphysical doubt as to
material facts." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165
(11th Cir. 2009) (internal citations omitted). A "mere
scintilla" of evidence is insufficient; the nonmoving party must
produce substantial evidence in order to defeat a motion for
summary judgment. *Id.*

Moreover, where "opposing parties tell two different
stories, one of which is blatantly contradicted by the record,
so that no reasonable jury could believe it, a court should not
adopt that version of the facts for purposes of ruling on a
motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380
(2007); *see also Logan v. Smith*, 439 F. App'x 798, 800 (11th
Cir. 2011) ("In cases where opposing parties tell different

versions of the same events one of which is blatantly contradicted by the record—such that no reasonable jury could believe it—a court should not adopt the contradicted allegations." (citations omitted)).

Additionally, the undersigned recognizes that while the Court is required to liberally construe a pro se litigant's pleadings, the Court does not have "license to serve as de facto counsel for a party . . . or to rewrite an otherwise deficient pleading in order to sustain an action." *GJR Invs., Inc. v. Cnty. of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir. 1998) (citations omitted), *overruled on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010); *see also Giles v. Wal-Mart Distrib. Ctr.*, 359 F.App'x 91, 93 (11th Cir. 2009) (internal citations and quotations omitted) ("Although pro se pleadings are held to a less strict standard than pleadings filed by lawyers and thus are construed liberally, this liberal construction does not give a court license to serve as de facto counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action.").

DISCUSSION

I. RES JUDICATA

"Res judicata is a judicially crafted doctrine, created to provide finality and conserve resources." *Maldonado v. United States AG*, 664 F.3d 1369, 1375 (llth Cir. 2011). "The doctrine

facilities the conclusive resolution of disputes by reducing the expense and vexation attending to multiple lawsuits, conserve[ing] judicial resources, and foster[ing] reliance on judicial action by minimizing the possibility of inconsistent decisions." *Shurick v. Boeing Co.*, 623 F.3d 1114, 1116 (llth Cir. 2010).   Res judicata bars suit on claims litigated in previous actions where all of the following four elements are present: "(1) there is a final judgment on the merits; (2) the decision was rendered by a court of competent jurisdiction; (3) the parties, or those in privy with them, are identical in both suits; and (4) the same cause of action is involved in both cases." *Maldonado*, 664 F.3d at 1375 (omitted citations).   If those elements are present, "[t]he court next determines whether the claim in the new suit was or could have been raised in the prior action; if the answer is yes, res judicata applies . . . [I]f even one of these elements is missing, res judicata is inapplicable." *In Re Piper Aircraft*, 244 F.3d 1289, 1296 (11th Cir. 2001).

The Defendant does not raise the issue of res judicata. (*See* Docs. 13, 14.)  "Dismissal by the court sua sponte on res judicata grounds, however, is permissible in the interest of judicial economy where both actions were brought before the same

court." *Boone v. Kurtz*, 617 F.2d 435, 436 (5th Cir. 1980).[2]  As noted above, this is the second action that Plaintiff has brought against Defendant.  The previous action was adjudicated on the merits in this Court, the parties were identical, and the cause of action was, as here, pursuant to 42 U.S.C. § 1983. (*Taylor I*, Doc. 11 at 1; *Taylor I*, Doc. 9 at 1.)  The action made claims concerning the inadequacy of nutritional information provided to Jail inmates.  (*Taylor I*, Doc. 1 at 4, 6-7.)  These dietary claims are similar to or identical with the claims brought in this action.  (*See* Doc. 1 at 9.)  Any claims which are not identical could have been brought in the earlier action. (Doc. 1 at 9 *compare Taylor I*, Doc. 1 at 4, 6-7.)  Accordingly, Plaintiff's nutritional claims are barred here from re-litigation by the doctrine of res judicata.  *See In Re Piper Aircraft*, 244 F.3d at 1296; *Boone*, 617 F.2d at 436.

II.  CONDITIONS OF CONFINEMENT

     As a pretrial detainee, the conditions under which Plaintiff is held are not subject to scrutiny under the Eighth Amendment.  *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). Rather, the Court relies "on the Due Process Clause rather than the Eighth Amendment in considering the claims of pretrial detainee."  *Id.*  "[I]n regard to providing pretrial detainees

---

[2] The Eleventh Circuit has adopted as binding all decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons." *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1574 (11th Cir. 1985).  To determine the constitutionality of the Jail's conditions, the Court must look to "contemporary standards of decency" (*Estelle v. Gamble*, 429 U.S. 97, 102 (1976)) to determine whether the Plaintiff has been deprived of "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).  "More specifically, in order to violate due process, the conditions of which [a plaintiff] complains must, at a minimum, have deprived him 'of a single human need.'" *Jordan v. Doe*, 38 F.3d 1559, 1565 (11th Cir. 1994) *quoting Wilson v. Seiter*, 501 U.S. 294, 305 (1991). Further, violations in prison conditions cases involve a state of mind of "deliberate indifference" to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Plaintiff complains of a number of plumbing issues in the Wedge, included non-functional sinks in cells and a sewage leak in the shower area.  (Doc. 1 at 4.) Plaintiff also alleges cleanliness issues, including mold in the shower area and dust building up on the air vents.  (Doc. 1 at 5, 7.)  None of these complaints states a claim for unconstitutional conditions in the Jail. *See Estelle*, 429 U.S. at 102.  Plaintiff has made no

showing that he has been deprived of a "single human need." *See Jordan*, 38 F.3d at 1565.  Even "less than sanitary" conditions do not create a violation where a serious deprivation has not been shown and where prison officials were not "deliberately indifferent to an excessive risk to inmate[] health or safety." *Jacoby v. Mack*, 2014 WL 2435655 at *17 (S.D. Ala. May 30, 2014) (*overruled on other grounds (Jacoby v. Baldwin Cnty.*, ___ Fed. App'x ___, 2016 WL 6575054 (11th Cir. 2016)) *citing Farmer*, 511 U.S. at 834.  The extensive records showing numerous plumbing repairs in the Wedge, arranged by Defendant's agent and executed by the Mobile County Public Works Department, are evidence that the Defendant has not been "deliberately indifferent" to Plaintiff's health and safety.  (Doc. 14-3 *generally compare Farmer*, 511 U.S. at 834.)

Plaintiff alleged that the Defendant "has repeatedly ignored sewage leak in our shower area" and offers his own affidavit and the Manassa affidavit in support of this contention.  (Doc. 1 at 4; Doc. 19 at 1–2; Doc. 20 at 1.) However, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.  Here, Plaintiff's allegation that Defendant ignored any sewage leak is blatantly

contradicted by the records showing the many work orders that
the Jail officials filed and which the Mobile County Public
Works Department *completed* in the Wedge, including at least one
work project responding to a "toilet leaking in shower." (Doc.
14-3 at 1.)  This toilet leak is expressly identified as being
located in "Metro Jail . . . 905 C wedge." (Doc. 14-3 at 1.)
Given these records, no reasonable jury would believe
Plaintiff's allegation regarding Defendant ignoring a sewage
leak. (*See id. compare Scott*, 550 U.S. at 380.)  Since the
allegation is blatantly contradicted by the record, the Court
may safely ignore it. *See Scott*, 550 U.S. at 380.

Regarding the cleanliness issues, the Defendant's agents
have performed large-scale cleaning tasks in the Wedge, such as
power-washing, and provided cleaning supplies to inmates to
perform more detailed routine cleaning. (Doc. 14 at 2; Doc. 14-
1 at 2.)  Thus, Defendant has not shown an indifference to the
cleanliness of the Wedge and Plaintiff has not had any serious
deprivation regarding either the plumbing or the cleanliness
issues. *See Farmer*, 511 U.S. at 834; *Jordan*, 38 F.3d at 1565.

With regard to the restrictions in place in the Jail, "'the
proper inquiry [for a pretrial detainee] is whether
[confinement] conditions amount to punishment of the
[unadjudicated] detainee' under the Due Process Clause of the

15

Fourteenth Amendment." *Wilson v. Blankenship*, 163 F.3d at 1291

*quoting Bell v. Wolfish*, 441 U.S. 520, 535 & n.16 (1979).

> In analyzing confinement conditions about which a
> pretrial detainee complains, a court must decide
> whether the detention officials intentionally imposed
> the restriction for a punitive purpose or whether it
> is reasonably incidental to a legitimate government
> objective.

*Wilson v. Blankenship*, 163 F.3d at 1291-92.  "If a restriction

is not reasonably related to a legitimate goal—if it is

arbitrary or purposeless—a court may infer that the purpose of

the government action is punishment."  *Lynch v. Baxley*, 744 F.2d

1452, 1463 (11th Cir. 1984).

Plaintiff complains of several restrictions and

requirements, including a requirement to assist in cleaning the

Wedge, restriction of personal mail to postcards, and

restrictions on visitation. (*See, supra.*)  There is no

allegation that the requirement to assist in cleaning the Wedge

is punitive. The requirement does not appear to be "arbitrary or

purposeless," but rather serves the practical purpose of keeping

the Wedge clean in spite of the Jail's limited resources, age,

and sea level location. (*See* Doc. 14 at 1, 2; Doc. 14-1 at 1.)

The Jail has stated that the postcard requirement for *personal*

mail is in place to prevent smuggling contraband into the

facility, which jail administrators was coming into the Jail

through the mail prior to the implementation of the current

rule. (Doc. 14 at 3; Doc. 14-1 at 2.)  There is no allegation

or evidence that the issues of lateness or missing mail are under the Defendant's control.  Finally, Plaintiff complains about restrictions on personal and attorney visitation.  There is no evidence that these restrictions are for punitive purposes.  "Only minimum restrictions are placed on attorney and professional[] visitation.  (Doc. 14 at 3.)  The restrictions on personal visitation are imposed to prevent smuggling of contraband and for "security and safety" purposes.  (*Id.*)  Thus, there is no evidence that any of the restrictions imposed on Plaintiff by the Jail are for any punitive purpose, and therefore they do not support a § 1983 claim.  *See Wilson v. Blankenship*, 163 F.3d at 1291-92.

III. POLICY AND PROCEDURE CLAIM

Defendant challenges the mail, visitation, and lockdown policies in place at the Jail, and the work requirements imposed on inmates by the Jail's Inmate Handbook.  (Doc. 1 at 7-9.)  To the extent possible, the undersigned analyzes these claims as allegations of supervisory liability with regard to Defendant. On this subject, the Eleventh Circuit had held that:

> [supervisory] liability under section 1983 must be based on something more than a theory of *respondeat superior*. Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions and the supervising official and the alleged constitutional violation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on

notice of the need to correct the alleged deprivation, and he fails to do so.

*Dolihite v. Maughon*, 74 F.3d 1027, 1052 (11th Cir. 1996). As Plaintiff has not established the violation of any rights, he cannot establish that Defendant acted with deliberate indifference in setting policy and procedures. *See, e.g., Cagle v. Sutherland*, 334 F.3d 980, 989 (11th Cir. 2003).

The Supreme Court entirely eliminated claims based on a failure to act because they allow supervisors to be held liable for subordinates' constitutional violations without adequate proof as to the supervisors' own actions and motivations, instead allowing plaintiffs to proceed against supervisors based merely on assumptions regarding both the supervisors' knowledge of certain patterns of behavior and their reactions thereto. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).  The Court in *Iqbal* stated that:

> [i]n a section 1983 suit . . . where masters do not answer for the torts of their servants — the term 'supervisor liability' is a misnomer.  Absent vicarious liability, each Government official, his or her own title notwithstanding, is only liable for his or her own misconduct.

*Id.*; *see also Iqbal*, 556 U.S. at 693 (Souter, J. dissenting)("Lest there by any mistake in these words the majority is not narrowing the scope of supervisor liability; it is eliminating Bivens supervisory liability entirely.").

In order to establish a causal connection between the supervisor's actions and the alleged constitutional violation, a

plaintiff must show either "a history of widespread abuse [that] puts the reasonable supervisor on notice of the need to correct the alleged deprivation" or an inference "that the subordinates would act unlawfully and failed to stop them from doing so." *Keith v. DeKalb Cnty., Georgia*, 749 F.3d 1034, 1047-48 (11th Cir. 2014)(citations omitted).  "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences."  *Id.* (*citing Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)).

Plaintiff complains about the policies regarding mail, visitation, and lockdown at the Jail, as well as the work requirements imposed by the Jail's Inmate Handbook.  (Doc. 1 at 7-9.)  These general allegations do not identify any "deprivations that would constitute widespread abuse."  *Keith*, 749 F.3d at 1047-48.  Additionally, the record before this Court is devoid of any evidence suggesting that Defendant was aware of a pattern of constitutional infirmities in regard to Plaintiff's condition of confinement at the jail.

IV.  QUALIFIED IMMUNITY

The Plaintiff does not state specifically whether the Defendant is sued in his official capacity, his individual capacity, or both.  Out of an abundance of caution, the

undersigned analyzes Defendant's qualified immunity under both capacities.

A.   OFFICIAL CAPACITY

It is well-established that, "suits against an official in his or her official capacity are suits against the entity the individual represents." *Parker v. Williams*, 862 F.2d 1471, 1476 n.4 (11th Cir. 1989), *overruled on other grounds in Turquitt v. Jefferson Cnty.*, 137 F.3d 1285, (11th Cir. 1998); *see Monell v Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)("[O]fficial capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent."); *Farred v. Hicks*, 915 F.2d 1530, 1532 (11th Cir. 1990).  For the purposes of qualified immunity, it is not disputed that Defendant is a state official.

Thus, to the extent that Plaintiff's claims are against the Defendant in his official capacity, his claims are effectively claims against the State of Alabama.  The Supreme Court has held that states and state officials are not "persons" subject to liability pursuant to 42 U.S.C. § 1983.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989).  Further, pursuant to the Eleventh Amendment of the United States Constitution, a state's own citizens may not sue unless the state consents to suit or Congress acts to abrogate immunity.  *See Carr v. Florence*, 916 F.2d 1521, 1524-25 (11th Cir. 1990).  There is nothing before

the Court that suggests that the State of Alabama has consented
to the suit or that Congress has acted to abrogate immunity.
Accordingly, Defendants have absolute immunity against the
claims asserted against them in their official capacities.

     B.   INDIVIDUAL CAPACITY

     "Qualified immunity offers complete protection for
government officials sued in their individual capacities if
their conduct 'does not violate clearly established statutory or
constitutional rights of which a reasonable person would have
known.'"  *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir.
2002) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).
Qualified immunity from suit is intended to "allow government
officials to carry out their discretionary duties without the
fear of personal liability or harassing litigation, protecting
from suit all but the plainly incompetent or one who is
knowingly violating the federal law."  *Lee v. Ferraro*, 284 F.3d
1188, 1194 (11th Cir. 2002) (internal quotation marks and
citations omitted).

     The initial inquiry in a qualified immunity case is whether
the public official proves "that he was acting within the scope
of his discretionary authority when the allegedly wrongful acts
occurred."  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)
(internal quotation marks omitted). This "discretionary
authority" hurdle is a "low, indeed almost invisible one."

*Williams v. Goldsmith*, 4 F. Supp. 2d 1112, 1123 (M.D. Ala. 1998). In this case, no one has disputed that Defendant was acting within the scope of his discretionary authority as a jail official with regard to any of the allegations in the Complaint.

Once the discretionary authority question is answered, courts utilize a two-part framework to evaluate individual capacity qualified immunity claims.  One inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation.  *Hope v. Pelzer*, 536 U.S. 730, 736 (2002) (*citing Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001)).  If the facts, construed in the light most favorable to the plaintiff, show that a constitutional right has been violated, another inquiry is whether the right violated was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The Eleventh Circuit has observed that in determining whether a right was "clearly established", the courts do not require a case directly on point; however, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotation marks omitted) *see also Wilson v. Blankenship*, 163 F.3d 1284, 1288 (11th Cir. 1998)(internal citation omitted)(emphasis in original)("General propositions and abstractions do not qualify for bright line, clearly established law. For qualified immunity

22

to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*.").  Both elements of the two part test must be present for an official to lose qualified immunity, and this two-pronged analysis may be done in whatever order is deemed most appropriate for the case.  *Pearson v. Callahan*, 555 U.S. 223 (2009).

As stated above, the Defendant has not violated any constitutional right of the Plaintiff's.  Thus, the Defendant is entitled to qualified immunity from suit in his personal capacity.  *See id.*

## CONCLUSION

After careful consideration of the record, and for the reasons stated herein above, it is recommended that the Motion for Summary Judgment (Docs. 13, 14) be granted, that this action be dismissed with prejudice, and that judgment be entered in favor of Defendant and against Plaintiff.

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific

written objections with the Clerk of this Court. *See* 28 U.S.C.
§ 636(b)(1); Fed.R.Civ.P. 72(b); S.D. Ala. L.R. 72(c).  The
parties should note that under Eleventh Circuit Rule 3-1, "[a]
party failing to object to a magistrate judge's findings or
recommendations contained in a report and recommendation in
accordance with the provisions of 28 U.S.C. § 636(b)(1) waives
the right to challenge on appeal the district court's order
based on unobjected-to factual and legal conclusions if the
party was informed of the time period for objecting and the
consequences on appeal for failing to object. In the absence of
a proper objection, however, the court may review on appeal for
plain error if necessary in the interests of justice."  11th
Cir. R. 3-1.  In order to be specific, an objection must
identify the specific finding or recommendation to which
objection is made, state the basis for the objection, and
specify the place in the Magistrate Judge's report and
recommendation where the disputed determination is found. An
objection that merely incorporates by reference or refers to the
briefing before the Magistrate Judge is not specific.

     **DONE** this 12th day of December 2016.

                                  s/BERT W. MILLING, JR.
                                  BERT W. MILLING, JR.
                                  UNITED STATES MAGISTRATE JUDGE